IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

KURT STUHLMACHER and          )
KELLY STUHLMACHER,            )
                              )
    Plaintiffs,              )
                              )
v.                            ) Cause No.: 2:10-CV-00467-JTM-APR
                              )
THE HOME DEPOT U.S.A., INC.   )
and TRICAM INDUSTRIES, INC.   )
                              )
Defendants.                   )

OPINION AND ORDER

This matter is before the court on the Motion in Limine to Bar the Testimony of

Plaintiffs' Expert Thomas Conry [DE 41] and the Motion for Summary Judgment [DE 43] filed

by the defendants, Home Depot U.S.A., Inc. and Tricam Industries, Inc., on December 21, 2012.

For the following reasons, the Motion in Limine to Bar the Testimony of Plaintiffs' Expert

Thomas Conry [DE 41] is **DENIED,** and the Motion for Summary Judgment [DE 43] is

**GRANTED IN PART** and **DENIED IN PART**.

Background

The plaintiff, Kurt Stuhlacher's, father purchased a Model 01-41000-00-foot fiberglass

Type IA stepladder from the defendant, Home Depot U.S.A., Inc., on October 31, 2008. The

ladder was manufactured by the defendant, Tricam Industries, Inc., in July 2007. Several ladders

from the subject ladder's production batch were tested and found to conform with the

authoritative safety guidelines, the ANSI A14.5 and OSHA. The subject ladder also was labeled

as conforming to the ANSI requirements.

1

On either October 31, 2008 or November 1, 2008, Kurt was using the ladder to construct the roof of a cabin porch. Kurt testified that he set up the ladder on flat level clay "so hard that if you struck it with a hammer, it would spark." Before climbing up the ladder, Kurt opened it and depressed the spreaders. He then stood in front of the ladder, grabbed a hold of the rails, shook it around, and lifted it up to make sure everything was level and square. He next leaned the ladder back and jiggled it around. Kurt stated that everything was perpendicular and that nothing was out of line before he climbed the ladder. Kurt went to the seventh step of the ladder, stopped, and began drilling a screw through a "purlin" into the rafter to his right. The ladder did not wiggle or wobble when he climbed the ladder, and none of the ladder's four feet sunk into the hard clay when he climbed up. While drilling, the ladder fell to Kurt's left. Kurt grasped the rafter to his left and tried to hold on to it. He twisted so that the front of the cabin was to his right. He could not hold on and fell straight down on the ladder. Kurt struck his groin on the right front rail near the first step. He suffered bruises on the left side of his stomach, left arm, left leg, left shoulder, and left side of his face. On November 2, 2008, Kurt sought medical treatment for his injuries.

After the fall, Kurt inspected the area where he set up the ladder and did not see any indentations in the ground. Kurt's wife, Kelly Stuhlmacher, was standing below Kurt within a foot or two of the ladder when the fall occurred. Kelly did not know what step Kurt was on before the fall. She agreed that the ladder fell to Kurt's left and that Kurt fell on the ladder. When Kurt began to fall she did not hear anything nor did she see the left spreader bar separate from the rail.

Post fall, the right rear spreader bracket rivets were pulled through the interior of the web

of the right rear leg.  The right spreader was buckled inward, and the right front spreader bracket was bent inward.  The ladder's rear section was "racked/twisted/offset" to the right, and the diagonal step braces were bent from the front to rear on the ladder's front left side.

Kurt and Kelly filed their complaint against the defendants on October 22, 2010.  The plaintiffs raise several counts, including: (1) Negligence-Strict Liability, (2) Negligence- Failure to Warn, (3) Negligence, (4) Breach of Warranty of Merchantability, (5) Breach of Implied Warranty of Fitness for a Particular Purpose, and (6) Loss of Consortium.

The plaintiffs hired Dr. Thomas Conry as an expert witness.  Conry holds a Ph.D. in mechanical engineering and a Master of Science degree from the University of Wisconsin-Madison.  His study has focused on mechanical design and contact mechanics, which is the scientific study of forces, motions, displacements, and stresses placed on components.  Conry is a licensed professional engineer in Illinois, Wisconsin, Arizona, and Texas.  He was a professor of engineering from 1971 until 2006, and he taught mechanical and structural analysis, engineering design analysis, mechanical and structural component design, materials testing laboratory, and senior project design.

Conry studied the ladder, the industry standard for ladder safety, ANSI A14.5, and the product design, among other things prior to preparing his expert report.  Conry observed that the rivets were not the same size as the ones called for in the product design and did not have a lip on the underside.  Conry also observed that the right rear rivet heads were indented in the right rail.  He concluded that this must have occurred during the manufacture because the marks on the inside of the rail could not have been made by Kurt's impact with the ladder.  If the indentation marks had been made from the bracket separating with the fiberglass rail, the only

indentation mark would correspond to the straight edge of the steel bracket, not the 10 mm radius arcs. This is because the edge of the bracket would have acted as a fulcrum, and the rest of the bracket would have been separated from the rail.

At his deposition, Conry conceded that he was not an expert in ladder manufacturing. As part of his analysis, he did not calculate the force required to bend the right front spreader bracket. He also admitted that the right spreader's buckle was consistent with impact. Conry estimated that the maximum force that could have caused the damage to the right spreader bar was 91 pounds. However, he did not state that this was in fact the amount of force applied from Kurt's ascent up the ladder. Conry also testified that it was possible that pressure was exerted on the ladder by Kurt digging the legs of the ladder into the ground. Conry further admitted that he did not determine the depth to which the rivets were indented into the exterior rail where the rivets were set and did not determine the degree to which he claims the right rear rail was weakened due to rivet indentation.

The defendants now move to exclude Conry's testimony and further argue that absent Conry's testimony the plaintiffs cannot prove that the ladder was defective and unreasonably dangerous or that a defect with the ladder was the proximate cause of Kurt's injury.

Discussion

The admissibility of expert evidence is governed by Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. *Winters v. FruCon Inc.*, 498 F.3d 734, 741 (7th Cir. 2007). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an

expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under **Daubert**, the court exercises a "gatekeeping" function to ensure that expert testimony is both reliable and relevant pursuant to Rule 702. **Lees v. Carthage College,** 714 F.3d 516, 521 (7th Cir. 2013); **Winters**, 498 F.3d at 741; **Kumho Tire Co., Ltd. v. Carmichael**, 526 U.W. 137, 141, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999). The examination applies "to all kinds of expert testimony." **U.S. v. Conn**, 297 F.3d 548, 555 (7th Cir. 2002)(noting that Rule 702 makes no distinction between "scientific" knowledge and other forms of specialized knowledge)(citing **Kumho Tire**, 526 U.S. at 149). The main purpose of the court's gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." **Kumho Tire**, 526 U.S. at 152.

In light of **Daubert** and **Kumho Tire**, the Seventh Circuit has endorsed a two-step analysis for district courts to use in evaluating expert testimony under Rule 702: first, the court must determine whether the expert's testimony is "reliable;" and second, the court must determine whether the expert's testimony is "relevant." **Lees,** 714 F.3d at 521; **Hardiman v. Davita Inc.**, 2007 WL 1395568 (N.D. Ind. May 10, 2007). Like all questions of admissibility, these regarding a witness's testimony are matters of law to be determined by the judge. **Hardiman**, 2007 WL 1395568 at *2 (quoting and citing **Porter v. Whitehall Labs., Inc.**, 791 F. Supp. 1335, 1342 (S.D. Ind. 1992), *aff'd*, 9 F.3d 607 (7th Cir. 1993). "The burden of showing an expert's testimony to be relevant and reliable is with the proponent of the evidence." **Bickel v.**

*Pfizer, Inc.*, 431 F. Supp. 2d 918, 921 (N.D. Ind. 2006).

To satisfy the reliability requirement, the expert must be qualified in the relevant field, and his opinion must be based on sound methodology. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); *see also Hardiman*, 2007 WL 1395568 at n.1 (discussing courts' ability to combine the qualifications inquiry into the reliability prong). In determining whether an expert is qualified to render an opinion, the court should consider his "full range of practical experience as well as academic or technical training . . . ." *U.S. v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005)(quoting *Smith*, 215 F.3d at 718). Still, "[a] court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter . . . . [T]he court's gatekeeping function [also] focuses on an examination of the expert's methodology." *Smith*, 215 F.3d at 718. Hence, an expert's work is admissible "only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff – deploying neither data nor analysis – is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000).

*Daubert* outlined the following factors in assessing an expert's methodology:

> (1) whether a theory or technique . . . can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique or method has met with general acceptance.

*Conn*, 297 F.3d at 555 (quoting *Daubert*, 509 U.S. at 593-94). No matter what type of specialized information is proffered, "the *Daubert* factors set forth above ought not be considered a definitive check list suitable for the evaluation of all kinds of evidentiary submissions involving specialized knowledge." *Conn*, 297 F.3d at 555-56. The list should be

flexible "to account for the various types of potentially appropriate expert testimony" rather than definitive or exhaustive. ***Deputy v. Lehman Bros., Inc.***, 345 F.3d 494, 505 (7th Cir. 2003). *See also* ***Lees,*** 714 F.3d at 521 ("[B]ecause there are 'many different kinds of experts, and many different kinds of expertise,' the reliability analysis should be geared toward the precise sort of testimony at issue and not any fixed evaluative factors.")(citing ***Kumho Tire***, 526 U.S. at 150). The court may tailor its approach using the ***Daubert*** factors as a starting point in an effort to evaluate the particular evidence before it. ***Conn***, 297 F.3d at 556.

The expert testimony must "fit the issue to which the expert is testifying." ***Chapman v. Maytag Corp.***, 297 F.3d 682, 687 (7th Cir. 2002)(internal citations and quotes omitted). Further, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." ***U.S. v. Mamah***, 332 F.3d 475, 478 (7th Cir. 2003)(citing ***Gen. Elec. v. Joiner***, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L.Ed.2d 508 (1997)). As the Supreme Court wrote: "[N]othing in either ***Daubert*** or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." ***Gen. Elec.***, 522 U.S. at 146. Therefore, an expert "who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." ***Zenith Elec. Corp. v. WH-T Broad. Corp.***, 395 F.3d 416, 419 (7th Cir. 2005); *see also* ***Mamah***, 332 F.3d at 478 ("The court is not obligated to admit testimony just because it is given by an expert."). Rather, the Seventh Circuit has reiterated: "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." ***Zenith Elec. Corp.***, 395 F.3d at 419 (collecting cases of reiteration).

Once evidence is deemed reliable, it still must be excluded if it is not relevant, which

under Rule 702 means that it is not likely "to assist the trier of fact to understand the evidence or determine a fact in issue . . . ." ***U.S. v. Hall***, 93 F.3d 1337, 1342 (7th Cir. 1996). The expert testimony must relate to an issue in the case, or it is not relevant. ***Daubert***, 509 U.S. at 591. To "assist" a jury, the Seventh Circuit has explained that the expert testimony will not aid a jury if it "addresses an issue of which the jury is already generally aware, and it will not contribute to their understanding of the particular dispute." ***Hall***, 93 F.3d at 1104. Alternatively, if, because of the expert's knowledge of relevant facts, the expert's particular use of those facts "will help the trier determine a fact, then the opinion is admissible under Rule 702." ***Porter***, 791 F. Supp. at 1343.

The defendants dispute whether Conry is qualified to give his expert testimony and whether his testimony is reliable. The defendants argue that Conry in unqualified because he has no experience in the design or manufacture of fiberglass ladders. The defendants point to Conry's concession that he lacks this experience and argue that although Conry considers himself an expert in materials, failure mechanisms, and root cause failures, he does not have any recorded experience with fiberglass rails, the material the ladder at issue was produced from. The defendants maintain that Conry cannot conclude that the ladder's rail strength was reduced without having knowledge of fiberglass materials.

The plaintiffs counter that Conry has extensive experience with the forces, motions, displacements, and stresses placed on components and systems of components. Conry has both a Ph.D. in mechanical engineering and a Master of Science degree from the University of Wisconsin-Madison. His study has focused on mechanical design and contact mechanics, which is the scientific study of forces, motions, displacements, and stresses placed on components.

Conry is a licensed professional engineer in Illinois, Wisconsin, Arizona, and Texas. He was a professor of engineering from 1971 until 2006, and he taught mechanical and structural analysis, engineering design analysis, mechanical and structural component design, materials testing laboratory, and senior project design. As part of his teaching, he focused on failure mechanisms and modes of failure to show students how to avoid such failures. He also had training in the area of fasteners and joints and deformation of materials. In his forensic activity, he has followed a reverse process. When a failed component or system was presented, he followed a logical engineering-based path to determine the root cause of the failure. Conry states that this failure analysis is a common engineering method. To prepare his opinion, Conry inspected the fiberglass rail, measured the rivets, and studied the design drawings. Conry conducted a failure analysis and constructed his theory on why the ladder failed based on all the physical evidence of the ladder and subject conditions.

Although Conry does not have experience in fiberglass ladder manufacturing, he has extensive experience in evaluating the reasons products do not perform as expected. The defendants argue that Conry's lack of experience dealing with fiberglass is reason enough to discount his expertise, however, the court does not agree. Certainly this is one factor that may affect the weight his testimony is given, but it does not nullify his experience evaluating the failure of machines. The defendants' vision of applicable experience is too narrowly construed. Conry is an expert in dealing with multiple types of materials and evaluating the faults with the products. Specifically, Conry has a background of evaluating faults with fasteners, joints, and the deformation of materials, and here the cause of the ladder's failure may have been with the bracket. This falls squarely into Conry's area of expertise. Conry has a history of following a

reverse process to determine the root cause of a product's failure and may shed light on why this particular "machine" did not perform as expected. The defendants only have attacked Conry's experience dealing with fiberglass and have not criticized Conry's experience applying this practice, determining why machines fail, or evaluating the failure of fasteners.

The defendants also criticize the methodology Conry used to reach his conclusion. The defendants argue that Conry's theory that the ladder fell because of the lack of a lip on the rivet's underside and a lack of rivet head dimension is not supported by testing, investigation, peer review, or authoritative literature. The defendants further argue that there is no evidence to support Conry's theory that the rivets were indented when they were set, weakening the fiberglass rail. Conry also conceded that the ANSI A14.5 was the authoritative standard for assessing ladder safety and did not claim the ladder would have failed to meet these requirements. Additionally, the defendants argue that Conry's theory of causation was based on speculation and not supported by the evidence.

Turning first to the defendants' critique of Conry's failure to test the ladder, not every expert opinion must be subject to testing. *Schmude v. Tricam Industries, Inc*., 550 F.Supp.2d 846, 852 (E.D. Wis. 2008). The Supreme Court intended for the *Daubert* factors to have considerable leeway. *Schmude*, 550 F.Supp. 2d at 852 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999)). In *Schmude*, the expert explained how a properly peened rivet was intended to fasten the leg of a ladder to the cap and described how in his opinion the misalignment of the ladder assembly during manufacturing caused the failure of the product. *Schmude*, 550 F.Supp.2d at 852. The court explained that the defect was not the type that lended itself to empirical testing. *Schmude*, 550

F.Supp.2d at 852. The court made special note that the strength of the metal used to manufacture the rivet was not in question and explained that the expert's theory was based on the misalignment of the rivet. *Schmude*, 550 F.Supp.2d at 852. The court went on to explain that no one knew precisely how the rivet became dislodged but that the expert offered one theory on how it may have occurred. *Schmude*, 550 F.Supp.2d at 853 ("The theory that a stepladder may collapse if the rivet fastening one of the legs to the cap fails is not 'rocket science.'").

Conry's theory similarly is based on the failure of the connection of the spreader bar bracket to the rail, and he explained that physical evidence showed that a pre-existing condition led to Kurt's fall. It is Conry's position that the substituted rivets were over-tightened and weakened the fiberglass rail during the manufacturing process, which fractured the rear rail and led to the disconnection of the spreader bar. The depressions in the rail showed that the spreader bar was over-tightened, and Conry concluded that the marks on the inside of the rail could not have been made by Kurt's impact with the ladder. If the indentation marks had been made from the bracket separating with the fiberglass rail, the only indentation mark would correspond to the straight edge of the steel bracket, not the 10 mm radius arcs, because the edge of the bracket would have acted as a fulcrum and the rest of the bracket would have been separated from the rail. Conry has maintained that the defendants' theory that the damage occurred as a result of the fall would have created a completely different set of bends in the spreader bar brackets.

Conry's theory is not the type that lends itself to the testing the defendants argue is pertinent to support his opinion. Similar to the expert in *Schmude*, Conry determined that the rivets were not the same ones called for in the product's design. Conry then examined the ladder

and concluded how the marks on the ladder most likely would have occurred. The marks showed that the incorrect rivets were over-tightened, causing weakness in the rail and the ultimate separation of the rail from the spreader. It is unclear how testing would substantiate his opinion which is based on the markings of the subject ladder. Although the defendants' expert based his opinion on the forces applied to the ladder, this is not telling of the method the plaintiffs' expert must employ. Rather, Conry relied on his specialized knowledge and applied the accepted engineering principles of Failure Mode Analysis to consider all the markings on the ladder and to determine the only manner in which all the markings could have come into being.

The court equates Conry's theory to that of an accident reconstruction expert. Conry studied the ladder and worked backwards to reconstruct the cause of the accident. "When evaluating the reliability of accident reconstruction experts, courts have considered such factors as whether the expert applied well-established engineering techniques to the particular materials at issue, whether the accident reconstruction methodology is based on the expert's practical experience in the area, whether novel methodology has been subject to publication, and the general acceptance of the techniques in the relevant engineering and accident analysis fields." *See **Smith v. Ford Motor Co.**,* 215 F.3d 713, 720-21 (7th Cir. 2000). In **Smith**, the Seventh Circuit explained that the reconstruction expert's failure to publish any articles related to his opinion in a peer reviewed magazine was not dispositive of the reliability of his opinion because if his reconstruction methodology was based on his extensive practical experience, his failure to publish did not cast doubt on the reliability of his analytical technique. **Smith**, 215 F.3d at 720. This suggests that extensive practical experience alone may satisfy the **Daubert** standards, although the court is cautious to rely on "expertise" without additional indicators of reliability.

*See **Zenith***, 395 F.3d at 419.

Here, such additional indicators are present. In addition to Conry's extensive practical experience considering why machines fail, he also has published a myriad of articles, and as many of the titles suggest, his publications have dealt with the failure of various machines. If Conry's system for analyzing broken machines is unreliable, the defendants may rely on criticisms of the methods he applied to analyze failures in his articles. In addition to his extensive expertise evaluating the failure of machines and the list of related articles, Conry also employed well-established engineering principles. Conry testified that it has been a core part of engineering education to study the reasons machines fail and to conduct failure analyses. For these reasons, Conry's failure to conduct tests is not dispositive of the reliability of his opinions that were based on his expertise and generally accepted engineering principles.

The defendants further argue that Conry stated that the pressure required to cause the marks from Kurt's fall would have been 91 pounds, a measure that the defendants' own expert could not reproduce from proper use of the ladder. However, Conry did not state that the pressure was in fact 91 pounds. Rather, Conry has explained that his calculation of spreader bar compression force of 91 pounds was not a direct statement of the forces on the spreader bar at the time of the accident, but was the maximum force that could have been applied to produce the damage. Any greater force would have created larger permanent deflections in the spreader bar. Conry explained that engineering calculations often require estimated values for unknown variables and that the rate of error is calculated based on the variance in the unknown and calculation method. Conry did not state that 91 pounds of pressure had to be applied when Kurt ascended the ladder to produce the results, rather it was an unknown variable that he chose for

his calculation. Conry was unable to calculate the exact force on the spreader bar prior to the rivet connection failure because the level of bending and cracking that existed prior to Kurt's impact with the ladder was unknown. Conry explained that the calculation contained a certain level of uncertainty but that level was quantifiable by determining the variance. Therefore, his methodology satisfied the ***Daubert*** standard.

Furthermore, contrary to the defendants' contention that Conry did not account for Kurt's impact with the bar, Conry explained that Kurt's contact with the bar could have distorted the spreader bar, adding to any previous bending. Any deflection in the spreader bar created by Kurt's impact would have been less severe, resulting in a much lower compressive force in the spreader bar prior to the rivet connection failure. In any case, as explained above, Conry has maintained that the spreader bar only could have separated in the manner he described because of the markings and indentations on the inside rail.

In support of their argument, the defendants rely on ***Morehouse v. Louisville Ladder***, 2004 WL 2431796 (D.S.C. June 28, 2004). In this case, the expert hypothesized that the ladder spontaneously buckled because of a weak or defective rail. ***Morehouse***, 2004 WL 2431796 at *5. He did not test his hypothesis and assumed that the bent leg on the ladder did not occur prior to the incident or from the plaintiff's impact with the ladder. ***Morehouse***, 2004 WL 2431796 at *5. The court ruled that the plaintiff's expert had not employed sound scientific methodologies to test his theory and instead developed a hypothesis to conform to the condition of the ladder post-accident. ***Morehouse***, 2004 WL 2431796 at *6. For this reason, the expert's testimony was unreliable under ***Daubert***. ***Morehouse***, 2004 WL 2431796 at *6. In reaching this decision, the court relied on the fact that the expert did not know the condition of the ladder before the

accident, and because the defendant lost his memory, the expert could not say whether the damage was from the defendant coming into contact with the ladder during the fall. *Morehouse*, 2004 WL 2431796 at *5-6.

Here, the plaintiff's father bought the ladder a few days before Kurt's fall, and Kurt was using the ladder for the first time on the day of his fall. Because the ladder never had been used prior to this incident, Conry made a well-supported assumption that the ladder was in the condition in which it left the store at the time of Kurt's fall. Conry also knew Kurt's actions prior to the fall and accounted for the contact that Kurt had with the ladder. Conry stated that certain markings on the ladder could not have been from Kurt's contact with the ladder. Rather, the only way the markings could have appeared was from the prior separation of the spreader bar from the rail as a result of the over-tightening of the rivets. Conry both knew the prior condition of the ladder and the course of events that led to Kurt's injury, including Kurt's movements while on the ladder and subsequent impact with the ladder. He applied his knowledge to determine how the marks came to exist on the ladder.

The defendants further argue that Conry's theory of causation was based on speculation because there was no evidence that the rivets were indented when set. However, it is Conry's position that physical evidence supports this conclusion. The depressions in the fiberglass rail and key witness marks reflect the over tightening of the rivets. The defendants' evidence may support a different conclusion, but at this point the court is not to weigh the evidence. Conry has presented one theory on how the marks came to exist and what may have caused Kurt's accident. It is a task for the jury to sort out which theory is better supported by the evidence, but at this point the court agrees that the physical markings on the ladder may support Conry's theory.

The defendants also argue that Conry conceded that the ANSI A14.5 was authoritative standard for ladder safety and that Conry does not claim that the ladder would fail any tests under this standard. To begin, compliance with safety regulations is not dispositive of the manufacturer's or seller's liability. **Ind. Code § 34-20-5-1.** Instead, it creates a rebuttable presumption that the product was not defective. **Ind. Code § 34-20-5-1.** Additionally, Conry did not concede that the subject ladder met the ANSI standards. At his deposition, Conry agreed that the ladder as designed complied with the authoritative safety guidelines. However, he did not agree, nor can it be certain, that the subject ladder complied with the ANSI guidelines. Although the reports on the batch test from the subject ladder's time of manufacture revealed that the ladders met the ANSI A14.5 standards, this is not telling that the ladder in question conformed to the standards. This is further supported because the subject ladder did not conform to the design specifications. The rivets did not have a lip and a smaller diameter rivet was used. Therefore, Conry's "concession" that the ladder complied with the applicable safety guidelines does not provide grounds upon which to exclude his opinion.

Finally, the defendants argue that Conry's theory was contrary to the facts of the case. Conry stated that the pressure could have been created by Kurt digging the rear ladder feet into the clay and squeezing both spreaders. However, Kurt testified that the ground was so hard that "if you struck it with a hammer the ground would spark." Conry explains that the defendants misinterpret his theory. It is the defendants' position that compressive force only can deliberately be generated by pushing on the front rails. Conry's testimony that it was possible a different force was applied by Kurt digging the ladder into the ground was a means of showing how other forces could be applied to the spreader bar. Conry attempted to show that by stepping

forward on the ladder, greater compressive forces may have been in play than if the user stepped up. Moreover, it is plausible that the parties had a different understanding of "digging" and that Conry used this term to refer to Kurt's set up of the ladder. This is evident by the plaintiffs' response that the defendants do not understand Conry's explanation of Kurt's set-up of the ladder.

Because ANSI tests require a great amount of flexibility, it was possible that Kurt applied compressive force to the spreader bar without being aware of it, such as when he shook the ladder to assure its stability or from the pressure of the ladder against the ground when he jiggled the ladder. This would have created a different force between the ladder and the ground than that produced by someone climbing up the ladder. Review of Conry's expert report does not reveal that his theory was based on Kurt digging the legs of the ladder into the hard ground. However, at his deposition, he stated that it was a possibility that the ladder was dug into the earth, bending the spreader bar. Conry did not state that this was the only way in which the 70 pound load necessary to bend the spreader bar could have been applied. Rather, he asserted that the rivets were applied improperly during the manufacturing process causing weakening and cracks in the fiberglass. The fiberglass had potential crack nucleation sites at the location of the rivet head and bracket edge indentations, and by applying an incalculable amount of force both during the ladder's set up and Kurt's ascent, the cracks weakened the structure around the rivet holes and caused the bracket to break during Kurt's use of the ladder.

Overall, the court agrees that Conry's theory does not require the testing promoted by the defendants, nor does ***Daubert*** demand such testing. An expert's opinion also is sufficient if the theory can be tested, is generally accepted, or is subjected to peer review. Conry had specialized

knowledge in the failure of machines, from which he was able to deduce from the marks on the ladder his theory on why the ladder failed. He applied generally accepted engineering principles, principles of failure analysis, and the scientific method to consider all of the markings on the ladder and to deduce the only manner in which the markings could have come into being. Conry has demonstrated that it is a common and long-standing practice within engineering to evaluate the failure of machines, an area in which he has extensive background. Such knowledge is a core to any engineering education. Specifically, the field of forensic engineering relies on applying a reverse process to explain all evidence and the possible path(s) that could have produced all the evidence.

Moreover, contrary to the defendants' opinion, Conry accounted for all the evidence. Conry stated that he considered Kurt's impact on the ladder and the possible effect that could have had on the shape of the spreader bar. He pointed to physical evidence to show why he believed the problems instead resulted from the manufacture of the ladder. It is his position that the rivets were improperly applied, and based on the markings, this had to occur during manufacture. This ultimately led to the separation of the spreader bracket from the rail and caused Kurt's fall once force was applied. The defendants assert that Kurt could not have exerted the force necessary to cause the damage, but Conry maintains that the force exerted is unknown and cannot be calculated because of the condition of the ladder and the damage caused by Kurt's impact.

Turning now to the defendants' motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of

law." ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322-23, 106 S. Ct. 2548 , 91 L. Ed. 2d 265 (1986);

***Kidwell v. Eisenhauer,*** 679 F.3d 957, 964 (7th Cir. 2012); ***Stephens v. Erickson****,* 569 F.3d 779,

786 (7th Cir. 2009). The burden is upon the moving party to establish that no material facts are

in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against

the moving party. ***Adickes v. S.H. Kress & Company***, 398 U.S. 144, 160, 90 S. Ct. 1598, 1610,

26 L. Ed.2d 142, 155 (1970); ***Stephens***, 569 F.3d at 786. A fact is material if it is outcome

determinative under applicable law. There must be evidence on which the jury could reasonably

find for the nonmoving party. ***Anderson v. Liberty Lobby, Inc***., 477 U.S. 242, 248, 106 S. Ct.

2505, 2510, 91 L.Ed.2d 202, 212 (1986); ***Stephens***, 569 F.3d at 786; ***Wheeler v. Lawson***, 539

F.3d 629, 634 (7th Cir. 2008). However, summary judgment may be entered against the non-

moving party if it is unable to "establish the existence of an essential element to [the party's]

case, and on which [that party] will bear the burden of proof at trial . . .". ***Kidwell***, 679 F.3d at

964 (citing *Benuzzi v. Bd. of Educ*., 647 F.3d 652, 662 (7th Cir.2011) (quoting *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

In deciding a motion for summary judgment, the trial court must determine whether the

evidence presented by the party opposed to the summary judgment is such that a reasonable jury

might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining
> whether there is the need for a trial--whether, in other words, there
> are any genuine factual issues that properly can be resolved only by
> a finder of fact because they may reasonably be resolved in favor of
> either party.
>
> [T]his standard mirrors the standard for a directed verdict under
> Federal Rule of Civil Procedure 50(a), which is that the trial judge
> must direct a verdict if, under the governing law, there can be but one
> reasonable conclusion as to the verdict.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986).

*See also* **Reeves v. Sanderson Plumbing Prods., Inc**., 530 U.S. 133, 149-51, 120 S.Ct. 2097, 2109, 147 L. Ed.2d 105, 120-22 (2000) (setting out the standard for a directed verdict); **Celotex Corp**., 477 U.S. at 322-23, 106 S. Ct. at 2553; **Stephens**, 569 F.3d at 786; **Argyropoulos v. City of Alton**, 539 F.3d 724, 732 (7th Cir. 2008)(stating that a genuine issue is one on which a reasonable fact finder could find for the nonmoving party); **Springer v. Durflinger,** 518 F.3d 479, 483 (7th Cir. 2008)(stating that a genuine issue exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party).

The plaintiffs raised six counts against the defendants including: (1) Negligence-Strict Liability, (2) Negligence- Failure to Warn, (3) Negligence, (4) Breach of Warranty of Merchantability, (5) Breach of Implied Warranty of Fitness for a Particular Purpose, and (6) Loss of Consortium. The defendants argue that summary judgment should be granted on each of these counts.

When exercising diversity jurisdiction, the court applies state substantive law and federal procedural law. **Ritchie v. Glidden Company**, 242 F.3d 713, 720 (7th Cir.2001). *See also* **Fidelity National Title Insurance Co. of New York v. Intercounty National Title Insurance Co.**, 412 F.3d 745, 750 (7th Cir. 2005) ("The Federal Rules of Civil Procedure, not state procedural rules, govern in diversity, as they do in federal-question, cases in federal district courts."). Indiana Law governs the substantive issues of the parties' dispute and consequently implicates the Indiana Product Liability Act.

The IPLA states:

This article governs all actions that are:
       (1) brought by a user or consumer;
       (2) against a manufacturer or seller; and
       (3) for physical harm caused by a product;
regardless of the substantive legal theory or theories upon which the action is brought.

**Ind. Code § 34–20–2–1.**

In order for liability to attach under the IPLA, a plaintiff must prove that "(1) the product was defective and unreasonably dangerous; (2) the defective condition existed at the time the product left the defendant's control; and (3) the defective condition was the proximate cause of the plaintiff's injuries." ***Deaton v. Robinson***, 878 N.E.2d 499, 501 (Ind. App. 2007) (citing *Coffman v. PSI Energy, Inc.*, 815 N.E.2d 522, 527 (Ind. App. 2004)). *See also* **Ind. Code § 34-20-4-1** (explaining that plaintiff must show both that product was in a defective condition and unreasonably dangerous); ***Warriner v. DC Marshall Jeep***, 962 N.E.2d 1263, 1267 (Ind. App. 2012). "'Unreasonably dangerous', for purposes of IC 34-20, refers to any situation in which the use of a product exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics common to the community of consumers." **Ind. Code § 34-6-2-146.** A product may be defective because of a defective design, a failure to warn of the dangers of the product's use, or a manufacturing flaw**. Ind. Code § 34-20-2-2.**

The defendants argue that the plaintiffs were unable to establish that the ladder was unreasonably dangerous because Conry's testimony must be excluded. As explained above, Conry provided sufficient support for his theories, and his testimony will not be excluded. Through his testimony, the plaintiffs presented evidence that the ladder was both defective because it was not built to design specifications and dangerous because the defect caused cracking and the spreader bar

to separate. Specifically, Conry explained that the ladder was defective because the rivets were over-tightened during the manufacturing process, thereby creating nuclei for cracks and weakening the rail. This defect was dangerous because once pressure was applied to the ladder, cracks formed, specifically around the rivets. This caused the rivets to separate from the rail and the spreader bar to fail. Moreover, the over-tightening of the rivets and consequential weakening of the rail was not observable to the user, nor was it obvious how much force the user was applying given the flexibility of the ladder. Therefore, the potential risk was not observable to the reasonably user.

The defendants also argue that the ladder is presumed not defective because it complied with the State of the Art and Applicable Governmental Regulations and that the plaintiffs have not rebutted this presumption. **Indiana Code § 34-20-5-1** states:

> In a product liability action, there is a rebuttable presumption that the product that caused the physical harm was not defective and that the manufacturer or seller of the product was not negligent if, before the sale by the manufacturer, the product:
>
> (1) was in conformity with the generally recognized state of the art applicable to the safety of the product at the time the product was designed, manufactured, packaged, and labeled; or
>
> (2) complied with applicable codes, standards, regulations, or specifications established, adopted, promulgated, or approved by the United States or by Indiana, or by an agency of the United States or Indiana.

When these conditions are met, the plaintiff bears the burden of establishing that he has evidence to overcome the presumption. *Schultz v. Ford Motor Co.*, 857 N.E.2d 977, 985 (Ind. 2006).

The defendants argue that they have uncontested evidence that the ladder was in conformity with the generally recognized state of the art guidelines applicable to the ladder at the time it was designed, manufactured, packaged, and labeled. The ladder was labeled, and ladders from the subject ladder's production batch were tested and found to conform to ANSI A14.5 and the OSHA

requirements. Conry stated in his deposition that he was not claiming that the ladder would have failed any ANSI performance test regardless of his criticism of the rivet head shape, size, and setting. For this reason, the defendants argue that the plaintiffs cannot rebut any presumption to the contrary.

The defendants misinterpret Conry's testimony. During the line of questioning at his deposition concerning the ANSI safety standards, Conry was asked whether he was going to claim in this case that the design of the accident ladder was deficient. Conry responded "The design, no.". (Conry Dep. p. 9) Conry admitted only that the design of the ladder would have complied. Conry also stated that he did not know whether the subject ladder would have failed any tests at the time the ladder was manufactured. (Conry Dep. p. 6) Therefore, neither the plaintiffs nor their expert admitted that the subject ladder complied with ANSI standards.

The plaintiffs do not dispute that there is a rebuttable presumption that the ladder was not defective. However, the plaintiffs argue that Conry's testimony rebuts the presumption. Specifically, Conry has demonstrated that the subject ladder was not produced in accordance with the design standards both because it used defective rivets and the rivets were over-tightened. For these reasons, it cannot be determined whether the subject ladder would have complied with the ANSI standards. Certainly, the ANSI would not approve the condition of a ladder that had cracks and would buckle under the type of use Kurt testified to conducting.

The defendants also argue that Conry's causation theory relies on Kurt's misuse of the ladder. The IPLA states that:

> It is a defense to an action under this article (or IC § 33-1-1.5 before its repeal) that a cause of the physical harm is a misuse of the product by the claimant or any other person not reasonably expected by the seller at the time the seller sold or otherwise conveyed the product to another party.

23

**Ind. Code § 34-20-6-4.**

To allocate fault to a plaintiff in a products liability action as a matter of law on the theory of misuse, the undisputed evidence must conclusively show that the plaintiff's use of the product was not reasonably expected to the seller. *Barnard v. Saturn Corp.*, 790 NE2d 1023, 1031 (Ind. App. 2003). The defendant bears the burden of showing that the plaintiff misused the product in an unforeseeable manner. *Marshall v. Clark Equipment Co.*, 680 NE2d 1102, 1108 (Ind. App. 1997).

The defendants argue that if Kurt squeezed the front and rear legs together to buckle the spreader, he did not use the ladder in the way it was intended. This would create the same amount of pressure that would be created by a 600 pound person during normal use, and the ladder only was intended for someone who weighed less than 300 pounds. However, the facts reveal that Kurt shook the ladder to make sure it was level and that all the feet were on the ground. This event may have caused an impact greater than that created by a person climbing up the ladder because the ladder may have impacted with the ground in a different way. Whether it was reasonably foreseeable that a user would shake the ladder to assure its stability in the manner Kurt did is a question better reserved for the jury. For these reasons, the defendants' motion for summary judgment on Count I is **DENIED**.

The defendants next argue that summary judgment must be granted on Count II, Negligence-Failure to Warn, because the plaintiffs have not provided evidence to support the allegation that a lack of warning caused Kurt's fall. Proof of the proximate causation element is measured according to a two-part inquiry that looks first to causation in fact. *City of Gary ex. rel. King v. Smith & Wesson*, 801 N.E.2d 1222, 1243 (Ind. 2003). The Indiana Supreme Court stated that factual causation presents a question of fact that asks if the injury would not have occurred without the

defendant's breach. ***City of Gary,*** 801 N.E.2d at 1243-44 ( citing *Cowe v. Forum Group, Inc*., 575 N.E.2d 630, 635 (Ind. 1991)). *See also* ***Paragon Family Restaurant v. Bartolini****,* 799 N.E.2d 1048, 1055 (Ind. 2003)("At a minimum, proximate cause requires that the injury would not have occurred but for the defendant's conduct.").

The second proximate cause inquiry regards the scope of liability and limits liability for those acts that, though a factual cause, were not "a natural and probable consequence, which in light of the circumstances, should have been foreseen or anticipated." ***Bader v. Johnson,*** 732 N.E.2d 1212, 1218 (Ind.2000). The question of proximate cause is a matter for the jury, but "it becomes a question of law where only a single conclusion can be drawn from the facts." ***Hamilton v. Ashton,*** 846 N.E.2d 309, 316 (Ind. App. 2006); ***Peters,*** 804 N.E.2d at 743.

The plaintiffs have not presented any evidence to show that the ladder's warnings and instructions were deficient. They have not pointed to any omissions or errors in the warnings labels or presented any argument on how additional warnings may have resulted in a different outcome. In fact, in their response to the defendants' motion in limine to bar Conry's testimony, the plaintiffs stated that "this is not a case involving defective design and inadequate warnings." (Pl.'s Br. p. 10)

At his deposition, Kurt testified that he read all the instructions and warnings on the ladder before he used it. He further stated that he knew the proper use of a ladder. When asked whether any warning would have stopped him from climbing or handling the ladder, Kurt replied that he did not know if a warning would have helped. Additionally, the plaintiffs did not respond to this argument in their response brief and have waived any challenge to the defendants' argument. ***Hernandez v. Cook County Sheriff's Office***, 634 F.3d 906, 913 (7th Cir. 2011); ***Laborers' International Union of North America v. Caruso***, 197 F.3d 1195, 1197 (7th Cir. 1999). For these

reasons, the defendants' motion for summary judgment is **GRANTED** with respect to Count II.

The defendants next argue that the IPLA supplants common law claims for negligence. The IPLA is a codification of the common law doctrine of strict liability, through which the Indiana legislature intended to preempt the field of strict liability in tort. ***Koske v. Townsend Engineering Co.***, 551 N.E.2d 437, 442 (Ind.1990). After amendments to the Act in 1995, it is "clear the legislature intended that the [A]ct govern all product liability actions, whether the theory of liability is negligence or strict liability in tort." ***Stegemoller v. ACandS, Inc***., 767 N.E.2d 974, 975 (Ind. 2002); ***Burt v. Mikita*** USA Inc., 212 F.Supp.2d 893, 897 (N.D. Ind. 2002) Though the Act describes separate proof schemes derived from strict liability and negligence standards, the Act itself provides for a single cause of action when a consumer seeks to recover from a manufacturer or seller for physical harm. ***In re Lawrence W. Inlow Accident Litigation, No. IP 99–0830–C H/K***, 2002 WL 970403 at *12 (S.D.Ind. Apr.16, 2002) (stating that the Act is "applicable to all actions for physical harm brought by a consumer against a manufacturer or seller of a product, regardless of the substantive legal theory.") (citations and quotations omitted); ***Tungate v. Bridgestone Corp***., 2004 WL 771191 at *6 (S.D.Ind. March 26, 2004). For this reason, the plaintiffs' common law negligence claim is merged into the IPLA claim.

Likewise, claims for breach of implied warranty sounding in tort are redundant to a count based on strict liability in tort, and both cannot be pursued. ***Bunkel v. Renovations, Inc***., 822 N.E.2d 150, 152-153 (Ind. 2005); ***Spangler v. Sears, Roebuck and Co.***, 752 F.Supp. 1437, 1449 (S.D. Ind. 1990); ***Thiele v. Faygo Beverage, Inc***., 489 N.E.2d 562, 584 (Ind. App. 1986). Again, the plaintiffs have not responded to this argument and have waived their right to do so. ***Hernandez***, 634 F.3d at 913; ***Caruso***, 197 F.3d at 1197. The court **GRANTS** the defendants' motion for

summary judgment on this count.

Based on the foregoing, the Motion in Limine to Bar the Testimony of Plaintiffs' Expert Thomas Conry [DE 41] is **DENIED,** and the Motion for Summary Judgment [DE 43] is **GRANTED IN PART** and **DENIED IN PART**.

ENTERED this 21st day of June, 2013

/s/ Andrew P. Rodovich
United States Magistrate Judge